UNITED STATES of America,

v.

Keith MOORE, Defendant.

No. 97 CR. 1026(JSR).

United States District Court,
S.D. New York.

May 12, 1998.

Mary Jo White, Mary Mulligan, Steven R. Peikin, New York City, for Plaintiff.

Roger L. Stavis, New York City, for Defendant.

## MEMORANDUM ORDER

RAKOFF, District Judge.

On January 29, 1998, defendant Keith Moore was convicted after a jury trial of possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k), and of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).[1] On February 4, 1998, defendant moved for a new trial pursuant to Fed.R.Crim.P. 33, on the ground that the Court, in preventing Moore from exercising one of his peremptory challenges for what the Court found was a discriminatory purpose, had erroneously applied the doctrine of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and its progeny. For the reasons stated below, the motion is denied.

On January 26, 1998, jury selection was conducted using the "jury box" method, in which an initial twelve members of the array were selected by lot and then, as individually excused (for cause or peremptorily), individu-

---

1. At defendant's request, the Court bifurcated the trial of the two charges, with the § 922(k) charge tried first so as to exclude evidence of defendant's prior felony conviction. After convicting defendant of the § 922(k) charge, the jury, after hearing additional evidence relating to the § 922(g)(1) charge, convicted him of that charge as well.

ally replaced by other members of the array likewise chosen by lot. Pursuant to Fed. R.Crim.P. 24(b), the Government was accorded six peremptory challenges and the defendant ten. These were to be exercised in six rounds, with the Government exercising one challenge per round and the defense exercising two challenges in each of the first four rounds and one challenge in each of the final two rounds.

In each of the first three rounds, the defendant used his two peremptory challenges to strike white males. At a sidebar conference following the third round, the Government asked the Court to take note of "initial indications of [a prohibited] pattern on [defense counsel's] part," Trial transcript ("Tr.") at 37, but made no further application at the time. At the start of the fourth round, the defendant indicated his intention to strike two more white males—which would have been eight consecutive such strikes. The Government then sought a sidebar conference, at which it made a "reverse *Batson* challenge" to defendant's use of his peremptories in this fashion (Tr. 42).

Without requesting a ruling on whether the prosecution had established a prima facie case of discrimination, defense counsel responded to the Government's challenge by stating that his reasons for seeking to strike these latest two white males were that one was an attorney and that the other (Juror # 11):

> works in a regulatory affairs department of a pharmaceutical company and I thought that it was my thinking that in view of the regulatory nature of serial numbers and all those kinds of things with a firearm that he was, in my estimation, particularly ill suited to serve as a juror in this case.

(Tr. 43–44). When asked by the Court to elaborate on this rationale, defense counsel was unable to do so, simply reiterating, essentially verbatim, his initial statement. (Tr. 44)

The Court, noting that special circumstances relating to the attorney juror had previously led defense counsel to (unsuccessfully) challenge him for cause, permitted the peremptory challenge as to that juror. (Tr. 44) But as to the challenge of Juror # 11, the Court stated as follows:

> THE COURT: Always in a peremptory situation I have to give substantial weight to counsel's judgment, but of course it can't carry the day fully or there would be nothing to *Batson* and its progeny. We have here what appears on its face to be a statistical pattern that departs very, very considerably from what would randomly have been the case if challenges had been randomly exercised with respect to this panel, which was both a racially and gender-mixed panel.
>
> We have a reason articulated by the defense that, with great deference Mr. Stavis to your judgment and to your good faith, which the Court does not in any way suspect, strikes me as not having any firm rational roots and therefore will operate, even if not intended to operate, in a prejudicial and pretextual manner.
>
> So I am going to disallow that challenge. You can look at the board again and exercise your second challenge on some other person.

(Tr. 44–45)

Despite this invitation, defendant chose to waive his second fourth-round challenge. (Tr. 45) He also waived his remaining two challenges, as did the Government, thus completing selection of the twelve member panel. Defendant also chose not to exercise his allotted peremptory challenge to the alternate juror that was then chosen.

Defendant's motion for a new trial is premised on his contention that the Court misapplied *Batson* when it refused to permit his peremptory challenge of Juror # 11, the juror who worked in the regulatory affairs department of a pharmaceutical company. *Batson* and its progeny establish a three-step test for determining whether a party has exercised a peremptory challenge in a manner that violates the Equal Protection Clause: first, the opposing party must make a prima facie showing that the peremptory challenge has been exercised on the basis of race, gender, or other such status entitled to equal protection; second, the burden then shifts to the party exercising the challenge to

offer a status-neutral explanation for the challenge; and third, the Court must then determine whether the opposing party has carried its burden of proving "purposeful discrimination," such as by showing that the proffered explanation for the challenge is a pretext for discrimination. *Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712; *Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *see also Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992)(doctrine applies equally to prosecutor and defendant); *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994)(doctrine applies equally to gender as to race).

Against this standard, Moore here argues that: (1) the Court erred in concluding that, based on the pattern of defendant's strikes alone, a prima facie showing of discrimination had been made; (2) the Court further erred in refusing to accept defense counsel's "neutral explanation" for his peremptory challenge of Juror # 11; and (3) the Court finally erred in finding that defendant had unlawfully discriminated in challenging Juror # 11, since the Court itself stated that defense counsel had acted in "good faith." For the reasons that follow, each of these points must be rejected.

As to the first point, defendant contends that the nineteen prospective jurors called during the first four rounds (the original twelve jurors plus those who replaced struck members) were, according to his figures, 79% white and 68% male. Given these high overall proportions of whites and males, he argues that his use of his first eight challenges solely against white males did not support a prima facie inference of discrimination. Affidavit of Roger L. Stavis, Esq., dated February 3, 1998 ("Stavis Aff.") at ¶¶ 3–4. This argument, however, is both erroneous and irrelevant.

■ It is erroneous, among other reasons, because defendant's statistics are seriously flawed. To begin with, they do not take account of the composition of the panel at the time defendant exercised each of his chal-

lenges. For example, in round four, when he exercised his last two challenges, the panel was 33% black and 42% female.[2] More importantly, he artificially separates race and gender, when in fact his challenges, by being directed exclusively at white males, implicated both. Thus, of the 19 jurors available for challenge by defense counsel through the first four rounds, only 11 (or 58%) were white males, yet defendant exercised all eight of his challenges toward this group. The chance of this happening randomly was minute. Thus, in raising its "reverse *Batson* challenge" the Government had more than ample basis to show a prima facie pattern of discrimination.

Moreover, defendant's first argument is now irrelevant because, at the time the Government made its "reverse *Batson* challenge" the defendant did not contend that the Government had failed to make out a prima facie case but, instead, responded by offering a purported neutral explanation for the challenge (Tr. 43). At this point, "the preliminary issue of whether [the prosecutor] had made a prima facie showing [became entirely] moot." *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

Defendant's second argument boils down to the assertion that once he offered a facially neutral justification for his challenge of Juror # 11, the Court was obliged to accept it at face value without moving forward to the third stage of assessing its bona fides. Thus, for example, he claims that in *Hernandez* "the Court held that a trial court must accept the proffered explanation as true, assuming it is not based upon the race of the prospective juror." Defendant's Memorandum of Law at 5. *See also Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

■ Again, the argument—which, if correct, would effectively nullify *Batson*—is both erroneous and irrelevant. No credibility findings are required at either of the first two stages of the three-step *Batson* analysis because their purpose is simply to oblige the

---

**2.** Defense counsel also fails to include in the list of those available for his challenges one of the black female jurors struck by the Government in

round two; but that juror was available for challenge by defense counsel in round one.

respective parties to come forward with prima facie showings of, respectively, discrimination and neutrality. If, first, the party raising the *Batson* challenge, or, second, the party responding, is unable to carry its burden of production, then the Court can rule on the challenge as a matter of law. But if both sides carry their respective prima facie burdens, then the Court is permitted to become a fact-finder and rule on the ultimate question of violation of equal protection. *Cf. Fisher v. Vassar College,* 114 F.3d 1332 (2d Cir.1997)(similar purpose served by three-stage burden-shifting in employment discrimination cases).

Nothing in either *Hernandez* or *Purkett* remotely precludes a court from moving forward to the third stage if there are indications that the proffered explanations—even if facially neutral—"may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. No court is compelled to acquiesce in a sham. Moreover, since the Court in fact proceeded to consider the ultimate issue, any alleged failure to stop at the second preliminary stage is now irrelevant and moot. *See Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859. The only question now is whether the Court's ultimate determination (the third stage) was correct.

■ As the Court expressly found when it moved to the third stage, defendant's proffered rationale for striking Juror # 11 lacked "any firm rational roots" (Tr. 45). Defense counsel's explanation that someone who works in a regulatory affairs department of a pharmaceutical company is, in view of the "regulatory nature of serial numbers," ill-suited to be a juror in a firearms case, is preposterous on its face. It was rendered even more absurd in context because defense counsel, well before the jury selection began, had expressly represented that his *sole* defense to the § 922(k) charge was lack of possession. Transcript of 12/22/98 Hearing, at 17, 21. *See also* Trial Tr., at 8–9, and 311–12.[3] Accordingly, any argument that a regulatory-minded juror would be particularly

sensitive to issues regarding "the regulatory nature of serial numbers" (Tr. 43) was a total red herring, since no such issue was in dispute.

When to this was added the fact that this was defendant's eighth straight challenge of a white male, the Court was more than justified in concluding, as it then expressly did, that the proffered rationale was "prejudicial and pretextual." (Tr. 45)

But was it "purposely" so? Defendant argues not only that the Court failed to find the requisite intent but also in effect found the opposite, stating that it did not "suspect" defense counsel's "good faith," and that the prejudicial and pretextual effect existed "even if not intended." (Tr. 45). Defendant reads far too much into a few words by which the Court merely sought, as an act of courtesy to defense counsel, to moderate any personal obloquy attendant on its finding of pretext and prejudice. While the Court regrets that, in so doing, it possibly created some arguable ambiguity, the truth is that there was never any doubt in the Court's mind that defendant's primary, if not sole, reason for challenging Juror # 11 was to keep as many white males as he could from serving on the jury. *See generally, Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859. Were it not for this conclusion, the Court would never have labeled defense counsel's proffered explanation both irrational and pretextual.

Moreover, even assuming, contrary to fact, that the Court entertained the possibility that counsel had no such impermissible motive, any such supposition was immediately contradicted by the fact that counsel, after being barred from striking an eighth consecutive white male, thereafter waived his remaining three peremptories as well as his alternate juror peremptory. What this meant, it was apparent to the Court, was that once counsel knew he could no longer get away with unexplained challenges to white males, he stopped using his challenges because he had no rational basis for striking anyone. The inference of intentional dis-

---

**3.** Indeed, it was partly on the basis of this representation that the Court agreed to bifurcate the trial.

crimination already drawn by the Court became at that point unmistakable.

In short, the Court correctly concluded before, and reiterates now, that the attempt to strike Juror # 11 was intentionally discriminatory in terms of both race and gender. While a District Court, in ruling on a *Batson* challenge, rarely has sufficient time to render the kind of detailed analysis that it might make in more leisurely circumstances, whatever arguable infelicities of expression may attend the Court's formulation should not be permitted to obscure the plain truth of what the Court actually found—here, intentional discrimination. Otherwise, the salutary purposes of *Batson* would be rendered a mirage.

For the foregoing reasons, defendant's motion for a new trial is denied.

SO ORDERED.